IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | |
| | : | |
| Petitioner, | : | |
| | : | Civil Action No. |
| v. | : | 1:24-cv-5809-TRJ-JCF |
| | : | |
| NATIONAL CREDIT SYSTEMS, INC. | : | |
| | : | |
| Respondent. | : | |

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Petitioner Consumer Financial Protection Bureau's ("CFPB" or "the Bureau") Amended Motion to Enforce a Civil Investigative Demand. (Doc. 23). For the reasons discussed below, it is **RECOMMENDED** that Petitioner's Amended Petition be **GRANTED IN PART** and **DENIED IN PART**.

## Procedural and Factual Background[1]

On October 21, 2022, the CFPB issued a Civil Investigative Demand (the "CID") to Respondent National Credit Systems, Inc. ("NCS") that "demands interrogatory answers, written reports, and documents." (Doc. 23-1 at 6). The CFPB is investigating NCS for "potential violations of the Consumer Financial Protection

_____

[1] References to docket materials will be made to the Court's CM-ECF pagination.

1

Act (CFPA's) prohibition on unfair, deceptive, or abusive acts and practices, the Fair

Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA), and

the FCRA's implementing rule, Regulation V." (*Id.*).

On November 9, 2022, NCS filed a petition seeking a Bureau order setting

aside the CID on the basis that the CFPB's statutory funding mechanism violated

the Appropriations Clause. (*Id.* at 7). The CFPB denied NCS's petition but gave

NCS until January 12, 2023 to comply with the CID. (*Id.*). After NCS announced

that it would not comply with the CID, the CFPB petitioned this Court to enforce the

CID on February 22, 2023. (*Id.* at 8). On March 10, 2023, NCS moved to stay this

proceeding pending the Supreme Court's decision in *CFPB v. Cmty. Fin. Servs.

Ass'n of Am., Ltd.* (Doc. 5). The Court granted the stay pending the Supreme Court's

decision, which it issued on May 16, 2024. (Doc. 11); *see also CFPB v. Cmty. Fin.

Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024).

On May 28, 2024, the parties filed a Joint Status Report in which they

indicated to the Court the Supreme Court's holding that the CFPB's funding

mechanism does not violate the Appropriations Clause of the United States

Constitution. (Doc. 12). The parties additionally represented that NCS no longer

intended to resist CID. (*Id.* at 2). The parties further stated to the Court that they

were "currently discussing modifications to the Applicable Period for Responsive

Materials and the production deadline" and "[w]hen NCS has completed its

production in compliance with the CID, the Bureau's petition will be moot and the

Bureau will seek dismissal of this action." (*Id*.). The parties requested that the Court "continue to stay any briefing or decision on the Bureau's Petition to Enforce the CID for 60 days to permit NCS to produce the responsive information." (*Id*.). The Court granted that request and stayed proceedings until July 29, 2024. (Doc. 13). On July 25, 2024, the parties reported that NCS had responded to the CID, and they requested that the Court further extend the stay of proceedings until August 28, 2024 and reschedule NCS's deadline to respond to the motion to enforce to September 4, 2024 in order "to permit the Bureau to review NCS's production and NCS to produce any outstanding responsive information." (Doc. 14 at 1-2). The Court granted that request and stayed proceedings until August 28, 2024. (Doc. 15). On August 28, 2024, the parties reported that NCS had responded to the CID, the CFPB had notified NCS of perceived deficiencies in its responses, and that they were continuing to confer about NCS's responses. (Doc. 16 at 1-2). The parties requested that the Court further extend the stay of proceedings until October 9, 2024 and reschedule NCS's response deadline to October 16, 2024 in order to "permit NCS to completely produce any outstanding responsive information and the Bureau to review NCS's supplemental productions." (*Id*. at 2). The Court granted that request and stayed proceedings until October 9, 2024. (Doc. 17 at 2). The Court also rescheduled NCS's response deadline to October 16, 2024. (*Id*.).

On October 17, 2024, NCS filed a motion for a 14-day extension of time to respond to the CFPB's petition. (Doc. 18). While the motion was untimely, NCS

said it believed that the parties were going to make another request for the stay to be continued but that, on October 16th, the CFPB's attorney advised NCS that the CFPB "cannot agree to further extend the stay." (*Id.* at 9). The CFPB did not oppose NCS's motion for an extension. (Doc. 19 at 1). On October 18, 2024, the Court directed the CFPB to amend its Petition to Enforce the CID by November 8, 2024. (Doc. 20 at 3). More specifically, the Court directed the CFPB to set forth in its amended petition which of its requests in the CID remained at issue and to provide the factual and legal basis for its contentions that NCS's responses are insufficient. (*Id.*). The Court directed NCS to respond to the amended petition by December 2, 2024. (*Id.*). The Court made any reply by the CFPB due by December 16, 2024. (*Id.*).

The CFPB filed its Amended Petition on November 8, 2024. (Doc. 23). NCS filed a motion for leave to file a brief of up to 80 pages on November 19, 2024. (Doc. 27). The CFPB responded to and the Court granted in part NCS's motion for leave on November 25, 2024, allowing NCS to file a brief of up to 50 pages. (Doc. 29; Doc. 30). In granting NCS's motion for leave, the Court ordered NCS's response to the Amended Petition due by December 20, 2024 and the CFPB's reply to that response due by January 17, 2025. (Doc. 30). NCS filed its response to the CFPB's Amended Petition on December 17, 2024. (Doc. 32). The CFPB filed its reply on January 17, 2025. (Doc. 38). With briefing complete, the undersigned turns to the merits.

## Discussion

### I.    Applicable Standards

12 U.S.C. § 5562(c) and (e) provide the CFPB with the ability to issue and enforce CIDs—a form of administrative subpoena—in federal district court. 12 U.S.C. §§ 5562(c), (e); *see also United States v. Kamal Kabakibou, MD, PC*, 522 F.Supp.3d 1307, 1313 (N.D. Ga. 2020) (describing a CID as "an administrative subpoena"). "A district court's role in a proceeding to enforce an administrative subpoena is limited." *EEOC v. Tire Kingdom, Inc.*, 80 F.3d 449, 450 (11th Cir. 1996). "To obtain judicial enforcement of an administrative subpoena, an agency such as the [CFPB] must establish four things: '[1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the [agency's] possession, and [4] that the administrative steps required…have been followed….' " *SEC v. Marin*, 982 F.3d 1341, 1352 (11th Cir. 2020) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). "All the agency must do in the first instance is make out a prima facie showing that the *Powell* criteria [listed above] are met." *Marin*, 982 F.3d at 1352. This can be accomplished through an investigator's affidavit. *Id.* " 'Once the government makes this preliminary showing, the burden shifts to the [subpoena recipient] to disprove one of the four *Powell* criteria, or to demonstrate that judicial enforcement should be denied on the ground that it would

be an abuse of the court's process.' " *Id.* (quoting *United States v. Centennial Builders, Inc.*, 747 F.2d 678, 680 (11th Cir. 1984)).

## II.   *Powell* Criteria

NCS appears to challenge only prong three of the *Powell* inquiry—arguing that the information sought is already in the CFPB's possession. (*See generally* Doc. 32) (ending most of its specific request discussions with "NCS properly responded"). It is not apparent from NCS's response to the Amended Petition that it challenges the legitimacy of the purpose underlying the investigation, the relevancy of the inquiries to the purpose of the investigation,[2] or the alleged compliance with the administrative procedures. Because the CFPB must establish that the four *Powell* factors have been satisfied, the discussion below addresses each factor. But since NCS appears to challenge only the third *Powell* factor, only in that corresponding section is NCS's response discussed in depth.

### A. Legitimate Purpose

Administrative agencies with law enforcement authority have broad investigatory power. *See, e.g., Marin*, 982 F.3d at 1352 (quoting *United States v. Fla. Azalea Specialists*, 19 F.3d 620, 624 (11th Cir. 1994) (noting the "broad investigatory power of administrative agencies")). The CFPB is permitted by § 5562

---

[2] As will be discussed later, there is one limited instance in which NCS appears to challenge the relevancy of an inquiry.

to issue a CID if it has reason to believe that a person may have information relevant to a violation of any provision of Federal consumer financial law. 12 U.S.C. § 5562(c)(1); *see also* 12 U.S.C. § 5561(5). "Federal consumer financial law" includes the laws that the CFPB is investigating NCS for potential violation of—the CFPA, the FDCPA, the FCRA, and the FCRA's implementing rule, Regulation V. *See* 12 U.S.C. § 5481(14).

Here, the CFPB issued the CID "to determine whether debt collectors or associated persons had engaged in various conduct that violated the CFPA, FDCPA, FCRA, or the FCRA's implementing regulation." (Doc. 23-1 at 12; *see also* Doc. 23-3 at 2). Agencies such as the CFPB have "a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it [the agency] wants assurance that it [the law] is not [being violated]." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950); *see also United States v. Ward*, No. 1:22-cv-1653-SCJ-JKL, 2022 WL 3336454, at *6 (N.D. Ga. June 29, 2022) ("In *United States v. Morton Salt Co.*, the Supreme Court recognized that agencies of the United States have broad investigatory powers"). Given that the CID states under the section "Notification of Purpose Pursuant to 12 C.F.R. § 1080.5" that the purpose of the investigation is to "determine whether debt collectors, or associated persons" have violated various Federal consumer financial

laws including the CFPA, the FDCPA, the FCRA, and the FCRA's implementing rule, Regulation V, as well as the fact that a CFPB investigator has provided an affidavit attesting to the inquiries' relevance, the CFPB has satisfied this first prong. (Doc. 23-3 at 2); *see also Marin*, 982 F.3d at 1352 (noting that making out a prima facie showing under the *Powell* criteria can be accomplished through an investigator's affidavit).

### B. <u>Relevance</u>

"The measure of relevance used in [administrative] subpoena enforcement actions is quite broad." *Fla. Azalea Specialists*, 19 F.3d at 624; *see also Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989) (an administrative subpoena will survive a relevance challenge so long as it "touches a matter under investigation"); *Morton*, 338 U.S. at 642-43 (stating that an agency may investigate merely on suspicion that someone is violating the law or to merely assure that the law is not being violated).

Under this exceedingly broad standard of relevance, it is difficult to say that any of the outstanding requests in the CFPB's Amended Petition fail to "touch" on a matter under investigation. *Sandsend*, 878 F.2d at 882. The CFPB's Amended Petition asks for an order directing NCS to produce complete responses to various subparts of Interrogatories 3 and 9, Requests for Written Report 1-8, and Document

Requests 4, 5, 9, 12-14, 16, 17, 24, and 26. (Doc. 23 at ¶ 26(a-b)).[3] As a careful

review of each of these individual requests shows, and in light of the broad standard

_____

[3] Interrogatory 3 generally asks for a description of NCS's debt collection activities, including the types and sources of debt collected, the identity of each original creditor or debt buyer for which the company collects debt, documentation NCS received from the client in the process of onboarding a debt, whether the company collects debt in the original creditor's name or in the company's name, the types of services provided by NCS, the number of persons who collect debt on behalf of NCS and their respective locations and employment status, NCS's use of independent contractors or like third parties, collection methods and techniques used by NCS, and a description of how employees, managers, and other parties involved in NCS's operations are compensated for debt collection activities. (Doc. 23-3 at 3-4). Interrogatory 9 seeks the identity of those responsible for undertaking various roles listed in subcategories under the interrogatory. (*Id.* at 6). Requests for written reports 1-8 seek information relating to consumer complaints or disputes, each debt for which NCS received a written notification from the consumer that the debt was disputed (within thirty days and outside of a thirty-day window), each debt for which NCS received an oral notification from the consumer that the debt was disputed, each debt for which the company furnished information to a CRA (credit reporting agency) prior to or without an initial communication with the consumer, identification of every legal action filed against NCS for violation of federal consumer financial laws, a list of every instance where the company made a telephone call relating to debt collection, and identification of all instances in which any consumer listed in the report produced in response to a prior request notified NCS in writing that the consumer wished NCS to cease communicating with the consumer. (*Id.* at 8-13). Document request 4 seeks all documents constituting, communicating, or describing NCS's policies and procedures relating to its debt collection activities, including emails, manuals, training materials, and other materials. (*Id.* at 14-15). Document request 5 seeks all documents constituting, communicating, or describing NCS's policies and procedures relating to its consumer reporting activities. (*Id.* at 16). Document request 9 seeks all templates, models, or form letters used for communications with consumers. (*Id.*). Document request 12 seeks documents relating to NCS's compliance or non-compliance with the FDCPA, the FCRA, the Furnisher Rule, and various other laws and regulations. (*Id.*). Document request 13 seeks all regularly-generated reports relating to debt collection activities. (*Id.* at 17). Document request 14 seeks all regularly-generated reports relating to consumer complaints or disputes about the company's consumer reporting activities. (*Id.*). Document request 16 seeks all documents relating to,

of relevance applied in the case of an administrative subpoena, the Court finds that the CFPB's outstanding CID requests noted in its Amended Petition are relevant to the investigation.[4]

## C. <u>Possession of Information</u>

The CFPB claims that the information it seeks in its Amended Petition is not already in its possession. (Doc. 23-1 at 14). More specifically, the CFPB claims that (1) some responses do not provide what has been sought (*id.* at 14-17); (2) some interrogatories NCS has answered reference documents that fail to contain the information sought (*id.* at 17); (3) other responses raise unspecific burden objections (*id.* at 18); (4) NCS has produced only current versions of some documents sought (*id.* at 18-19); (5) some written reports have been produced in invalid formats (*id.* at 19-20); (6) some written reports include unexplained codes (*id.* at 20); and (7) some

---

indicating, or reflecting NCS's contact or attempted contact with a consumer at the consumer's place of employment, by phone, email, text message, or in person. (*Id.*). Document request 17 seeks all documents relating to, indicating, or reflecting the company's contact or attempted contact with a consumer's references by phone, email, text message, or in person. (*Id.*). Document request 24 seeks all contracts and agreements entered into between NCS and any original creditors or debt buyers. (*Id.* at 18). Lastly, document request 26 seeks all policies and procedures concerning the company's document retention policies. (*Id.*).

[4] NCS does claim that "additional emails the Bureau seeks in which the NCS employees may have referenced a policy are not relevant to the investigation of a law violation—NCS produced the policies themselves." (Doc. 32 at 25-26) . The Court disagrees given the already-discussed broad reach of relevance in the administrative subpoena context.

written reports do not provide answers to all parts of requests (*id.* at 20-21). The Court addresses each category below.

### 1.  <u>Allegedly Insufficient Responses Generally</u>[5]

Interrogatory 3(h)(i) seeks the "sequence, frequency, and implementation" of NCS's collection methods and techniques, as well as the identity of the persons who implement said methods. (Doc. 24-4 at 4). The CFPB claims that NCS's response to subpart (h)(i) of interrogatory 3 does not "answer the question regarding the frequency of actions and the persons responsible for those actions." (Doc. 24-2 at 3; *see also id.* at 17). NCS responds that it understands interrogatory 3(h)(i) to be asking NCS to "identify the category of persons responsible for implementing the 'methods and techniques' " that NCS employs. (Doc. 32 at 22). NCS asserts that the Bureau "appears to be overlooking the entirety of the detailed and thorough written response that NCS provided to this request." (*Id.*). The Bureau replies that "[i]t appears to be NCS's position that review of the letter templates that are referenced in the written response, [], and a policy will answer the question about frequency." (Doc. 38-1 at 11) (citing Doc. 32 at 5).

The Bureau's citation to NCS's response brief at page 5 (Doc. 32) reveals what the Court believes to be the misunderstanding between the parties with respect to interrogatory 3(h)(i). The Bureau cites to NCS's response brief section concerning

---

[5] Any materials cited from Doc. 24 or Doc. 32 and their associated attachments are under seal.

interrogatory 3(h)(ii). (Doc. 32 at 5-6). On pages 21-23 of its response brief, however, NCS addresses interrogatory 3(h)(i)—the subject of the instant dispute. (*Id.* at 21-23). Had the Bureau evaluated those pages, along with pages 4-5 of NCS's response to the CID, it would have encountered ample information regarding the "frequency" information that it seeks. (Doc. 24-5 at 4-5). NCS need not respond further to interrogatory 3(h)(i).

Interrogatory 3(i) seeks a "description" of compensation NCS paid to employees, managers, and other parties related to the company's provision of its services. (Doc. 24-2 at 15). It specifically requests a "description of how employees, managers, independent contractors, subcontractors, vendors, and other third parties, including outside lawyers and law firms, are compensated for Debt Collection Activities, including the amounts and types of compensation." (Doc. 24-4 at 4). The CFPB claims that NCS's response to 3(i) fails to identify "how NCS pays its client services associates or garnishment associates and [] leaves out what it pays to all law firms beyond the payments that are 'primarily on a contingency fee.' " (Doc. 24-2 at 15). NCS understands interrogatory 3(i) to be asking for NCS "to describe the compensation structure of several *broad categories* of persons," which NCS asserts it did. (Doc. 32 at 7) (emphasis in original). NCS further contends that its response "provides the requested description and also describes how, and in what amounts, it pays its law firms." (*Id.*). The Bureau replies that "NCS does not dispute that it has not provided compensation details about at least two groups of employees, identified

12

elsewhere in NCS's CID response as 'client services associates' and 'garnishment associates', which is specifically what the request seeks." (Doc. 38-1 at 7). The Bureau adds that NCS's ability to produce compensation details about other groups of employees, (Doc. 24-5 at 6-7), demonstrates that NCS can produce answers responsive to "the specific type of answer requested." (*Id.* at 8). Last, the Bureau takes the position that NCS should be required to provide specific compensation details with respect to each "outside firm" that NCS uses. (*Id.*).

The Court agrees with the CFPB. For one, NCS's response to interrogatory 3(i), by simply providing compensation details for collectors and managers, is not a full and complete response to "what this question asks." (Doc. 32 at 7). This request indeed "asks for a description of how several broad categories of individuals" such as "employees, managers, independent contractors, subcontractors," and others are compensated. (*Id.*). But unless collectors and managers are the only types of employees that NCS has, NCS has not completely responded to this request. NCS is ordered to provide the information that the Bureau is still seeking with respect to client services associates, garnishment associates, and any other employees or contractors that are responsive to this request. With respect to the outside law firms, on the other hand, the Court finds that NCS has responded to this request. It is true that the request seeks "a description" of compensation for various parties. NCS has provided that. "Outside Firms: Contingency fees run from 20-30% [from] the sums recovered for the original creditor." (Doc. 24-5 at 7). This qualifies as a "description"

of compensation for outside firms. NCS need not provide further information with respect to outside law firms.

Interrogatory 9 seeks the identity of persons responsible for certain activities and a description of roles and responsibilities where applicable. (Doc. 24-2 at 15). The interrogatory contains a list of activities for which the responsible party should be identified. (Doc. 24-4 at 6) (subsections a-j). The CFPB asserts that NCS fails to "provide any information on [the] roles and responsibilities" of the list of persons it identified in response to interrogatory 9. (Doc. 24-2 at 15-16). NCS, on the other hand, asserts that it *did* provide the roles for each person identified in response to interrogatory 9 and that although it "did not also provide a description of the responsibilities of each individual," those responsibilities are "described in Joel Lackey's declaration." (Doc. 32 at 8). The CFPB argues in reply that "NCS only generally describes the responsibilities of the individuals identified, not each individual's responsibilities with respect to the activities specified in subparts (b)-(j) of Interrogatory No. 9." (Doc. 38-1 at 8). The Bureau adds that Joel Lackey's declaration provides insufficient supplementary information. (*Id.*).

The Court agrees with the CFPB. While NCS has generally responded to interrogatory 9, it has failed to "describe" each employee's role and responsibility "for each" of the activities for which the CFPB seeks answers. (Doc. 24-5 at 15). For subsections b-j of interrogatory 9, NCS simply lists the employees who are involved in each activity. And Lackey in his declaration simply provides, for example, that

14

collection managers "manage[] a group of approximately 22 collection representatives." (Doc. 32-2 at 7-8). In conjunction with the CFPB's reply brief, NCS is ordered to provide additional information regarding how each employee listed in NCS's response to interrogatory 9 specifically relates to the activities listed in subsections b-j.

Document request 12 seeks all documents relating to NCS's compliance or non-compliance with various laws and regulations prohibiting unfair, deceptive, or abusive acts and practices. (Doc. 24-2 at 16). The CFPB asserts that, under "its agreement with the Bureau, NCS was required to produce such materials for the period of January 1, 2020, through May 30, 2024….The Bureau's review of the materials NCS produced shows NCS did not produce these materials for prior to 2022." (*Id.*). NCS plainly states that the CFPB "is not correct" and goes on to note that various of the 27 documents it produced in response to request 12 "existed long before 2022." (Doc. 32 at 9-10). The Bureau replies that "the only documents NCS produced that are in fact responsive to this request are the eight Excel spreadsheets— reflecting evaluations of individual employees' compliance with the FDCPA—it shows in its screenshot, all of which show dates in 2024." (Doc. 38-1 at 9).[6]

---

[6] It is worth noting, however, that the excel files show the date of most recent modification, not creation. (Doc. 32 at 10). Thus, some or all of the excel files could have originated in years prior to 2022—contrary to the Bureau's position.

While NCS does appear correct that it produced various documents purportedly in response to request 12 that were created prior to 2020, the Bureau nonetheless asserts that only the excel documents, which all come from 2024, are actually responsive to request 12. (*Id.*). First, the request seeks "[a]ll documents relating to [NCS's] compliance or non-compliance with" various federal and state laws and regulations. (Doc. 32 at 9). The files NCS produced that were modified prior to 2020 appear clearly relevant to request 12. Any document "relating" to legal compliance is broad and could conceivably encapsulate all of the documents that NCS produced. Second, request 12 does not, as the CFPB claims, seek "documents reflecting assessments of whether NCS complies or complied with its own policies and procedures, and with relevant laws, including those from before 2022." (Doc. 38-1 at 9). Nowhere in the actual language of document request 12 does the CFPB reference NCS's own policies. (*See* Doc. 24-4 at 16-17). The CFPB takes the position that to be compliant with request 12, "NCS must produce any documents in its custody, possession, or control, on the same topic as the eight spreadsheets it shows, but containing data from prior to 2022." (*Id.*). To the extent that such material exists, the Court agrees that NCS must produce it. But to the extent that such material does not exist—i.e., that NCS already produced all of its responsive materials—NCS need not attempt to reply further to this request.

Document request 13 requests all regularly generated reports relating to NCS's debt collection activities. (Doc. 24-2 at 16). More specifically, the request

16

seeks regularly-generated reports relating to "Debt Collection Activities," which the CID itself defines as "all activities related in any way to efforts to collect Debt either directly or indirectly." (Doc. 24-4 at 19). The CFPB asserts that "NCS failed to produce reports that NCS identified as existing in its response to Interrogatory No. 3(e), and in other documents that NCS has produced." (Doc. 24-2 at 16). NCS first notes that its response to interrogatory 3 states that reports it provides to its client— those which the CFPB claims NCS failed to produce—"do not include reports on attempts to collect." (Doc. 24-5 at 4). Therefore, according to NCS, the reports it identified in response to interrogatory 3 do not relate to "Debt Collection Activities" as the CID defines that term and therefore are not responsive to document request 13. (Doc. 32 at 12).

NCS takes a limited view of what constitutes "Debt Collection Activities." It contends that reports relating to the "number of accounts" or reports about the nature of an account as in "delinquency or in default," for example, are not "related in any way to efforts to collect debt." (Doc. 32 at 11). This is an improperly narrow reading of both the definition of "Debt Collection Activities" as well as document request 13. As a result, NCS is ordered to respond fully to document request 13—meaning that it must produce all "regularly-generated reports" relating to its Debt Collection Activities—including the types of reports listed by the Bureau in its request. (*Id.*).

Document request 14 seeks all regularly generated reports relating to consumer complaints or disputes about NCS's consumer reporting activities. (Doc. 24-2 at 16). The CFPB claims that "NCS has not produced such materials for the applicable period of January 1, 2020, through May 30, 2024." (*Id.* at 17). In response, NCS claims that it "has produced the precise information requested." (Doc. 32 at 15). More specifically, NCS notes that the Bureau seeks the "type, frequency, or distribution of complaints and disputes," and information "relating to the accuracy or completeness of information the Company furnished to a CRA" as well as the "resolution of such complaints or disputes." (*Id.*). According to NCS, it produced a specific file containing the requested information for a time period beyond the one requested by the CFPB. (*Id.*). The Bureau responds that the documents NCS provided in response to request 14 "are not all regularly generated reports on this topic for the entire Applicable Period" because "existing 'weekly reports cards' are also responsive to this request." (Doc. 38-1 at 10-11).

To the extent that NCS has additional "weekly report cards" that it has not produced, it is ordered to produce them. But outside of potentially outstanding "weekly report cards," NCS need not respond further to this request.

Document request 26 requests all policies and procedures concerning NCS's document retention policies. The CFPB claims that "NCS produced instead only one copy, marked 'draft,' of a retention policy." (Doc. 24-2 at 17). NCS, on the other hand, asserts that it produced a file named "Policy and Procedure outline.docx" in

July of 2024. (Doc. 32 at 20). NCS further states that it supplemented in August 2024 its July response with a document named "Data Security Policy.pdf." (*Id.*). The Bureau provides in its reply that NCS's supplemental response to document request 26 "resolved the deficiencies." (Doc. 38-1 at 3). Document request 26 has therefore been resolved.

## 2. <u>Allegedly Insufficient Referenced Documents</u>

The Bureau claims that NCS's response to interrogatory 3(h)(i) references materials that "do not provide the frequency of use of the methods or information on the persons who implement them" as the specific interrogatory subsection seeks. (Doc. 24-2 at 17). Given that the Court has already dealt with this particular subsection interrogatory, it will not address it further here.

## 3. <u>Allegedly Unspecific Burden Objections</u>

The CFPB takes issue with NCS's response to document request 24. Document request 24 seeks all "contracts and agreements, including notes and records of all oral contracts and agreements, and subsequent communications modifying or terminating such contracts and agreements, entered into" by NCS and any original creditors or debt buyers. (Doc. 24-2 at 18; *see also* Doc. 24-4 at 18). NCS responded to document request 24 by producing a written statement claiming that NCS has "no easy way of identifying and segregating out the management company agreements executed during the review period." (Doc. 24-2 at 18) (internal quotations omitted). The CFPB asserts that NCS cannot claim burden "as a

legitimate objection here and, even if it could, this unspecific, unsupported claim would not suffice." (*Id.*). NCS states that it provided 3,681 documents in response to document request 24. (Doc. 32 at 23). As part of this response, NCS provided to the CFPB an explanation of why there is "no easy way" of identifying and segregating out the management company agreements and, because of this, why NCS did not produce additional documents responsive to this request. (*Id.* at 24). NCS also states that it provided to the Bureau 10 examples of management company agreements—which it explains are "virtually identical to the individual apartment property" contracts—contemporaneous with the filing of its response in opposition to the Amended Petition. (*Id.*). The Bureau replies by stating that any burden argument by NCS has been waived and that any outstanding materials responsive to this request are not privileged. (Doc. 38-1 at 12).

The Court agrees with the Bureau that NCS has essentially waived any substantive objections it may have to the CID. *FTC v. Tracers Info. Specialists, Inc.*, No. 8:16-MC-18TGW, 2016 WL 3896840, at *4 (M.D. Fla. June 10, 2016) (Respondent's "failure to comply with the administrative procedure provided by the statute and the implementing regulation bars [Respondent's] assertion of substantive objections to the CID in court."). Thus, NCS's responsibility to produce documents responsive to the request and within the applicable period, while admittedly burdensome in light of the volume of contracts it possesses, is not the Bureau's

problem. NCS must produce any "additional documents responsive to this request." (Doc. 32 at 24).

### 4. **Current Versions of Documents**

The CFPB contends that while a number of its requests "require production of all versions of specified documents," NCS has "only produced the current versions" of the documents so specified. (Doc. 24-2 at 18). This includes, according to the Bureau, Document Requests 4 and 5. Document requests 4 and 5 seek "all documents constituting, communicating, or describing NCS's policies and procedures relating to its debt collection and consumer reporting activities." (*Id.* at 18-19; *see also* Doc. 24-4 at 14). The Bureau states that a review "of NCS's production has shown that NCS produced versions of formal policies, not all documents communicating or describing these policies and procedures throughout the applicable period." (Doc. 24-2 at 19). NCS claims that the additional emails "the Bureau seeks in which the NCS employees may have referenced a policy are not relevant to the investigation of a law violation—NCS produced the policies themselves." (Doc. 32 at 25-26). NCS adds that "[t]he Bureau concedes that NCS also produced some emails (18) in response to these requests, but offers no explanation as to why it believes more exist." (*Id.* at 26).

To the extent that NCS may have "additional emails" responsive to document requests 4 and 5, it is ordered to produce them. (*Id.* at 25). It is not enough to simply assert that any additional emails responsive to those requests "are not relevant." (*Id.*

at 26). As noted earlier, the scope of relevance in the context of an administrative subpoena is quite broad. But to the extent that NCS "has nothing further to produce," meaning that it has truly produced all emails responsive to requests 4 and 5, the Court will not require it to go beyond the reach of the Bureau's requests as originally worded.

Document Request 9 seeks all templates, models, or form letters used for communications with consumers. (Doc. 24-2 at 19). The CFPB contends that "NCS has not produced the versions of these letters as they existed in 2021, 2022, or 2023, and did not produce any versions of the six letters identified in NCS's response to Interrogatory No. 3(i)." (*Id.*). NCS responds by simply stating that it "produced all documents in its possession responsive to this request [document request 9]" and that it "has nothing more to produce." (Doc. 32 at 27). The Bureau replied that NCS's supplemental response to Document Request 9 "resolved the deficiencies." (Doc. 38-1 at 3). Document request 9 has therefore been resolved with respect to this argument.

### 5.  **Invalid Formats**

The CFPB contends that the reports NCS produced in response to Requests for Written Report 7 and 8 "include columns of data without clear headings or a description of the fields in the columns, making it impossible to know what the data represents." (Doc. 24-2 at 19). The CFPB additionally takes issue with NCS's production relating to Written Report 7 (columns A & J) and Document Requests 16

and 17, "where data is reported in numeric sequences, but sequences are not of uniform lengths, suggesting that the data is corrupted." (*Id.* at 19-20). The CFPB lastly adds that "NCS…seems to admit its error here, noting in its October 17 filing that its production includes 'stray characters or more than one piece of data contained in a single spreadsheet cell.' " (*Id.* at 20). NCS responds by stating that it "has *twice* addressed this issue" already. (Doc. 32 at 27) (emphasis in original). NCS adds that in its "Response to Deficiency List 1 NCS explained that the spreadsheet columns A through P corresponded with the 16 subparagraphs of Written Report request 7(a) through (p)." (*Id.* at 29). In addition, "the Bureau acknowledged its understanding of NCS's explanation [relating to requests for written report 7 and 8] without further complaint in its next laundry list of alleged deficiencies contained in Deficiency List 2." (*Id.* at 30). NCS further explains why the sequences of data are not of uniform lengths: "[a]s the company [NCS] assigned unique identifiers to more accounts over a long period of time, the number of digits used to create unique identifiers increased from 4 to 5, then 6, then 7." (*Id.* at 34). NCS ends this section of its response by simply providing that the "data is not corrupt." (*Id.*). The Bureau replies that "[p]roviding the explanations separate from the reports makes it extremely difficult to use the reports, and fails to comply with the requirement that the reports are answered fully in writing under oath." (Doc. 38-1 at 13) (citing 12 C.F.R. § 1080.6(3)(ii)).

As far as the Court can tell, the CFPB has the information it sought in written reports 7 and 8. The Bureau does not provide otherwise in its reply brief. (*See* Doc. 38-1 at 13-14). The Court therefore rejects the Bureau's contention that NCS has failed to comply with the requirements that reports are answered fully in writing. As a reminder, the language of written report 7 is thus: "list every instance where the Company made a telephone call relating to Debt collection during the Applicable Period, and for each, provide the following information, with the information responsive to each subpart in a separate column." (Doc. 24-4 at 13) (listing column categories). NCS appears to have done this. It does not seem to be in dispute that NCS provided the information responsive to each subcategory in written response 7 in a separate column. Written request 7 did not explicitly say to include in the heading for each column the category name itself. As long as columns 1-16 proceed in the same order that the categories appear in the Bureau's CID (which NCS has represented to the Court that they do, (*see* Doc. 32 at 29)), the Court sees no problem with what NCS has produced. The Bureau has the information it requested. NCS need not respond further to written reports 7 and 8.

### 6.  Unexplained Codes

The CFPB takes issue with NCS's response to Document Requests 16 and 17. (Doc. 24-2 at 20). The Bureau contends that a "number of NCS's written reports make use of codes for which it has not provided any data dictionaries or other explanations, making it impossible to determine the meaning of the entries." (*Id.*).

As a result, according to the Bureau, it "cannot interpret this data" and therefore "does not have the materials sought." (*Id.*). NCS first responds by contending that the "Bureau is wrong when it accuses NCS of not producing 'any' data dictionaries or other explanations of the codes" but "right when it identifies, for the first time, specific codes in the exhibits to Ms. Baldwin's declaration which are not contained in the data dictionary NCS did provide." (Doc. 32 at 35). NCS adds that, "[c]ontemporaneously with the filing of this response, NCS has provided to the Bureau an additional sixteen (16) translation tables comprising more than 3 gigabytes of data and containing more than forty (40) million code translations." (*Id.* at 35-36). NCS contends that the "Amended Petition should be denied as moot as to this request on the basis that NCS has provided additional translations tables which will enable to the Bureau to understand the codes contained in the Activity Ledgers produced by NCS." (*Id.* at 36). The Bureau replies that "NCS's reliance on separate translation tables, and piecemeal instructions regarding those tables conveyed to Mr. Lackey by a Windebt representative [], makes it extremely difficult to use" the materials NCS sent in response to document requests 16 and 17. (Doc. 38-1 at 14).

NCS has provided the Bureau with what it sought. Document requests 16 and 17 state that if "logs contain abbreviations or shorthand, provide a dictionary or glossary sufficient to interpret all such abbreviations or shorthand." (Doc. 24-4 at 17). Neither request states, contrary to the Bureau's position, that NCS must produce "reports containing information as legible text to the Bureau's staff." (Doc. 38-1 at

15). As the Court sees it, asking for a "dictionary or glossary sufficient to interpret" shorthand or abbreviations implies that the Bureau understood the possibility that documents produced in response to requests 16 and 17 may not come in text legible to the Bureau's staff. (Doc. 24-4 at 17). It is reasonable, however, to require NCS to produce a "dictionary or glossary" that addresses all relevant shorthand or abbreviations within the files it produced in response to requests 16 and 17. To the extent NCS has not produced such a glossary in complete fashion, it is ordered to do so. What NCS is not required to do, however, is review its entire document productions corresponding to requests 16 and 17 to translate each code themselves into a form legible to the Bureau's staff. This is plainly not what requests 16 and 17 sought as originally constructed. NCS need not respond further to document requests 16 and 17.

### 7. <u>Insufficient Written Reports</u>

The CFPB finally alleges that "NCS has failed to answer numerous portions of the Requests for Written Reports, without adequate explanation or excuse." (Doc. 24-2 at 20). More specifically, the Bureau alleges that NCS has failed to answer in full Requests for Written Report 1 (subparts (c), (e), (h), (i)), 2 (subpart (j)), 3 (subparts (g), (j), (k)), 4 (subpart (i)), and 7 (subparts (g), (h), (i), and (m)).[7] (*Id.* at

---

[7] The Bureau tells the Court that "NCS's production of updated responses to Written Report Nos. 2 and 3…resolved the deficiencies as to those" two requests. (Doc. 38-1 at 3). As a result, the Court will not address reports 2 and 3 further.

21). NCS responds to each in its Response to the Bureau's Amended Petition as follows. First, NCS contends that it specifically responded to Request for Written Report 1 subparts (c) and (e) on August 28, stating that it does not record the data the Bureau seeks in those subparts. (Doc. 32 at 37-40). NCS states essentially the same with respect to subpart (h) and (i). (*Id.* at 40). Nonetheless, NCS provided "all notes fields on all accounts during the CID period" to the Bureau such that the Bureau "has the data it wants" with respect to subpart (i). (*Id.* at 41). In sum, NCS states that it either does not have the data requested in the outstanding portions of written report 1, or it does not store the data in a structured format as the CFPB requests it. (*Id.* at 36-41). NCS next contends that the Bureau "is incorrect" insofar as it suggests that NCS has failed to answer subsection (i) of Written Report Request 4. (*Id.* at 42-43). NCS claims that it "populated Column I in the data file it produced." (*Id.* at 43). NCS lastly addresses Written Report Request 7, subparts (g), (h), (i), and (m). (*Id.*). These requests seek the home phone number, mobile number, work number, and duration of every phone call NCS made to consumers. (*Id.*). NCS states that in its response to Deficiency List 1 in August, it "explained that the data was not missing and that column (g) (the consumer's home phone field) and column (i) (the consumer's work phone field) were, in fact, populated with data corresponding to requests 7(g) and 7(i) of the request." (*Id.* at 44). NCS goes on to state that it "does not distinguish between cell phone numbers and landline numbers" in its data software and that "NCS cannot identify only the cell phone numbers, which is what

subpart (h) of WR7 [written request 7] requests." (*Id.* at 45). NCS adds that its software "does not store the duration of any telephone call because the phone system is completely separate from the debt collection system." (*Id.* at 46). NCS further provides that its response to Document Request 18 in August of 2024 in fact provided, in metadata form, the call duration for nearly 9 million telephone calls. (*Id.* at 46-47). As a result, according to NCS, it "*did* provide the duration of every call, [just] not in the spreadsheet which contains all the other columns in response to WR7." (*Id.* at 48). In sum, NCS contends that it did in fact provide data in response to subparts (g) and (i), and that its response to subpart (m) was empty because its software does not distinguish between "cell phone numbers and residential telephone numbers in its system of record." (Doc. 32 at 45). Further, NCS's response to subpart (m) was empty because, according to NCS, such data is not recorded in its software. (*Id.*). Again though, NCS states that it did provide the duration of every call as subpart (m) requests, just not in the spreadsheet that contains all other columns in response to written report request 7. (*Id.* at 48). The Bureau replies with respect to written report 1 that NCS has waived any burden argument it attempts to assert and should be required to produce the information. (Doc. 38-1 at 15-16). The Bureau adds that if "NCS is asserting that it cannot [track its investigative efforts] without seriously hindering normal operations, that is, essentially, an admission that NCS's normal operations are undertaken without any conception of whether they are in compliance with the law." (*Id.* at 16). The Bureau adds with respect to written report

4 that it "cannot confirm whether" NCS populated information in Column I of the data file it produced because NCS did not bates number its production as required by the CID instructions. (*Id.* at 16-17). The Bureau does not address written report request 7 in the "written reports that do not provide answers to all parts of the request" section of its reply brief. (*Id.* at 15-16).

The Bureau's reply with respect to written report 1 subsections (c), (e), (h), and (i) appears to overlook what NCS has said with respect to those items. NCS has essentially stated to the Bureau (and in documents submitted to the Court) that NCS does not distinguish between direct or indirect disputes (subsection (c)), it does not track record investigation results in a structured data format (subsection (e)), it does not record "resolution" dates (subsection (h)), and that it does not record in a format that can be searched the date on which results of an investigation were communicated to the consumer (subsection (i)). (Doc. 32 at 37-41). In response, the Bureau simply states that "NCS argues that it complied, because it has produced copies of the information in its systems, in an unstructured format…NCS argues that the burden of doing more than producing the data should allow them to forego a more fulsome answer…NCS did not raise this burden argument administratively and has, therefore, waived it." (Doc. 38-1 at 15). But as reviewed immediately above, NCS has not asserted any burden-related argument with respect to subsections (c), (e), (h), or (i). Instead, it has represented to the Bureau (and the Court) that it simply does not have the data that the Bureau seeks. Moreover, while the information

responsive to subsection (i) is not recorded in a manner that can be searched, NCS nonetheless produced all of its notes fields on all of its accounts during the applicable period so that the Bureau could attempt to discover when the date of results of an investigation were communicated to a consumer. (Doc. 32 at 41). While failing to respond generally to CID requests is improper, the Bureau cannot attempt to require a CID recipient to produce data that simply does not exist. NCS need not respond further to written report request 1. With respect to written report request 4, NCS has provided a sworn declaration, including a screenshot, demonstrating that column I had been populated within a produced file named "item4.csv." (Doc. 32-1 at 13). The Court has difficulty discerning what exactly the Bureau means when it says it "cannot confirm whether" NCS populated column I because NCS failed to "Bates number its production." (Doc. 38-1 at 16-17). Regardless of whether NCS provided bates numbers for its production, it appears clear that column I within the file responsive to written report request 4 has been populated. The Bureau has not made any real showing that NCS failed to respond to subpart (i) of written report request 4. The same applies with respect to subsections (g), (h), (i), and (m) of written report request 7. As a result, NCS need not respond further as to written report requests 1, 4 and 7.

### D. <u>Compliance with Administrative Steps</u>

The CFPB claims it has "followed all applicable procedural requirements under the CFPA and its implementing regulation related to the issuance of a CID."

(Doc. 24-2 at 21) (citing 12 U.S.C. § 5562(c); 12 C.F.R. § 1080). The Bureau adds that the CID was "issued by a Deputy Assistant Director of the Office of Enforcement," included a "detailed Notification of Purpose advising NCS of the nature of the conduct under investigation," and was "duly served on NCS by certified mail." (Doc. 24-2 at 21).

"Each civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation." 12 U.S.C. § 5562(c)(2). A CID may be served by "depositing a duly executed copy in the United States mails, by registered or certified mail, return receipt requested, duly addressed to such person at the principal office or place of business of such person." § 5562(c)(8)(C). The Bureau is specifically required to provide a CID recipient with a "notification of purpose." 12 C.F.R. § 1080.5. And the "Director of the Bureau, the Enforcement Director, and the Deputy Enforcement Directors [] have the nondelegable authority to issue a" CID. 12 C.F.R. § 1080.6.

The Declaration attached to the initial Petition to Enforce of Sarah Baldwin, an Enforcement Attorney in the Office of Enforcement at the CFPB, establishes that the administrative steps required in the case of issuance of a CID have been followed here. (Doc. 1-2). For one, Baldwin states in her declaration that the CID "was issued by a Deputy Assistant Director of the Office of Enforcement" and that the CID "included a Notification of Purpose advising NCS of the nature of the conduct under

investigation." (*Id.* at ¶¶ 19-20); *see also* 12 C.F.R. § 1080.5; § 1080.6. Baldwin adds that the CID "was duly served on NCS by certified mail on October 21, 2022." (*Id.* at ¶ 7); *see also* 12 U.S.C. § 5562(c)(8)(C). Seeing as the Bureau may establish a prima facie showing under *Powell* via an investigator's affidavit, the Bureau has satisfied this final element. *Marin*, 982 F.3d at 1352.

### Summary

Document Requests 9 and 26 have been resolved.

It is **RECOMMENDED** that the Bureau's Amended Petition to Enforce its CID with respect to Interrogatory 3(h)(i), Written Reports 1, 4, 7, and 8, and Document Requests 16 and 17 be **DENIED.**

It is **RECOMMENDED** that the Bureau's Amended Petition to Enforce its CID with respect to Interrogatory 9 and Document Requests 13 and 24 be **GRANTED**.

It is further **RECOMMENDED** that the Bureau's Amended Petition to Enforce its CID with respect to Interrogatory 3(i) and Document Requests 4, 5, 12, and 14 be **GRANTED IN PART** and **DENIED IN PART**, as outlined above.

The Clerk of Court is **DIRECTED** to terminate the referral to the undersigned United States Magistrate Judge.

**IT IS SO ORDERED** this 27th day of January, 2025.

*/s/ J. Clay Fuller*
J. CLAY FULLER
UNITED STATES MAGISTRATE JUDGE

32